P & M CONSTRUCTION COMPANY, INC., *v.*
HAMMOND VENTURES, INC.

1. CONTRACTS—GOLF COURSE CONSTRUCTION—EXTRAS—FINDINGS—
EVIDENCE.
    Evidence presented in action for balance due under contract and
    for extras in connection with construction work at defendant's
    golf course, *held,* sufficient, albeit disputed, to support trial
    judge's findings for plaintiff as to balance due and for extras
    and for defendant as to amount of damages awarded it for
    cost of remedying plaintiff's failure to perform with respect
    to spreading topsoil.

2. APPEAL AND ERROR—NONJURY CASES—PREPONDERANCE OF EVI-
DENCE.
    The Court of Appeals does not substitute its judgment on ques-
    tions of fact in a nonjury case unless the evidence clearly
    preponderates in the opposite direction.

3. CONTRACTS—CONSTRUCTION—SUBSTANTIAL PERFORMANCE.
    *Substantial performance,* as applied to building and construction
    contracts, is a relative term, whereby partial nonperformance
    must be viewed in relation to the full performance promised, and
    is said to be made where all the essentials necessary to the full
    accomplishment of the purposes for which the thing contracted
    for has been constructed are performed with such an approxi-
    mation to complete performance that the owner obtains sub-
    stantially what is called for by the contract, imperfections
    in matters of detail which do not constitute a deviation from

REFERENCES FOR POINTS IN HEADNOTES
[1] 20 Am Jur, Evidence § 1177.
[2] 5 Am Jur 2d, Appeal and Error § 839.
[3, 4] 17 Am Jur 2d, Contracts §§ 375, 378.
    13 Am Jur 2d, Building and Construction Contracts §§ 41, 43.
[5] 20 Am Jur 2d, Costs § 16.
    Right to costs where judgment is against plaintiff on his com-
    plaint and against defendant on his counterclaim.    75 ALR
    1400.

the general plan contemplated for the work, compensable in damages, not preventing performance from being regarded as substantial performance.

4. SAME—SUBSTANTIAL PERFORMANCE—REMEDYING DEFECTIVE PERFORMANCE.

Cost of remedying defects for plaintiff's failure of performance of contract for construction of golf course *held*, properly deducted from amount found due under the contract and for extras, as such recovery of damages by defendant is permissible, where plaintiff is found to have sustained its burden of proof of substantial performance of the contract.

5. COSTS—NEITHER PARTY PREVAILING ON APPEAL.

No costs are awarded either party in action for balance due under contract for construction of a golf course wherein defendant sought damages for failure of performance as to certain items under contract found to have been substantially performed by plaintiff, where neither party has prevailed on appeal.

Appeal from Kalamazoo; Hadsell (Phillip A.), J., presiding. Submitted Division 3 December 7, 1965, at Grand Rapids. (Docket No. 391.) Decided May 24, 1966.

Complaint by P & M Construction Company, Inc., a Michigan corporation, against Hammond Ventures, Inc., a Michigan corporation, for failure to pay balance owed on a contract to construct a golf course. Counterclaim by defendant for failure to perform contract. Findings for plaintiff. Defendant appeals. Plaintiff cross-appeals. Affirmed.

*Sullivan & Hamilton* (*Robert P. Hamilton*, of counsel), for plaintiff.

*Paulson, Bennett, Palmer & Lewis* (*Richard H. Paulson*, of counsel), for defendant.

HOLBROOK, J.    P & M Construction Company, Inc., contracted with Hammond Ventures, Inc., defend-

ant, to perform certain basic construction work on defendant's 9-hole golf course on the outskirts of Kalamazoo. This work was to be done on an equipment-rental basis with total amount to complete plaintiff's contract not to exceed $18,400.

Plaintiff performed its work on the golf course in the spring and summer of 1962 and defendant paid plaintiff on account for such work from time to time. Plaintiff claimed complete performance of the contract in the month of September, 1962, and demanded payment of $2,090.55, the claimed balance due and in addition, $744.90 as an extra for constructing a practice green and the sums of $360 and $183.50 for other claimed extras performed at the request of defendant. Defendant refused payment claiming plaintiff breached the contract in that the work performed was not in accord with specifications for which defendant claimed damages.

Thereupon, plaintiff sued defendant for $3,378.95 and defendant answered denying plaintiff's claims and counterclaimed for damages in the amount of $10,420.85.

The case was heard before the court without a jury and the trial judge ruled that plaintiff was entitled to $18,400 (balance $2,090.55) under the terms of the contract for rentals and materials furnished and $1,288.40 for extras. He further ruled that plaintiff did not complete the work in accordance with the terms of the contract and that defendant was entitled to recover on its cross-complaint in the sum of $2,495; resulting in a judgment for plaintiff in the amount of $883.95. Upon entry of this judgment, defendant appealed and plaintiff cross-appealed.

Defendant-appellant requests this Court to vacate and set aside the finding of the trial court for plaintiff for any sum in excess of $744.90 and that said amended amount be applied against the sum of

$2,495 found by the trial court due defendant from plaintiff on its cross-complaint. Plaintiff-appellee requests this Court to set aside the trial court's finding for defendant and enter a judgment for plaintiff in the sum of $3,378.95 awarded plaintiff by the trial court, reduced by the amount of $249.25 to be allowed defendant on its cross-complaint. The pertinent facts appear to be as follows:

Plaintiff agreed to perform earth moving and grading work for defendant's golf course by a proposal signed by plaintiff's president, Rocco A. Martin, January 12, 1962, which proposal was accepted by defendant. The pertinent portions of the contract appear to be as follows:

"PHASE A—Earthmoving and grading work for the construction of tees, greens, sandtraps, fairways, and adjacent areas.   *   *   *

"For the necessary work to complete Phase A we propose the following:   Work to be performed on an equipment rental basis with total amount to complete work of Phase A   *   *   *   not to exceed $18,400.00.   *   *   *

"3. All work shall be done under the supervision of the golf course architect and to his satisfaction. He shall decide all questions which arise as to the quality and acceptability of materials furnished, work performed, manner of performance, rate of progress of work interpretation of the plans and specifications, *acceptable fulfillment of the contract,* and approvals of payments.   *   *   *

" 5. The golf course architect shall make a final inspection of all work included in the contract, as soon as practical after notification by the contractor that the work is complete and ready for acceptance. If the work is not acceptable to the golf course architect at the time of such inspection he shall inform the contractor as to the particular defects to be remedied before final acceptance can be made."

On the grading and dimension plan appears the following:

"All existing topsoil shall be saved and stockpiled and used to cover those areas disturbed by construction. All tees, and green aprons, and fairway areas shall be covered with at least 6″ of topsoil. Areas outside the fairways shall be covered with at least 4″ of topsoil."

In accordance with the contract, plans and specifications were furnished by defendant to plaintiff.

Defendant admitted that the charge of $744.90 of plaintiff for the practice green, was an extra, and was a proper charge but claimed the other extras of plaintiff were in performance of plaintiff's contract. Defendant further claimed that plaintiff failed to perform said contract, in that it did not remove stone from the golf course, as required in the contract, and further failed to replace topsoil to the proper depth, where the topsoil was removed in performing the work.

Plaintiff actually expended $22,000 in doing the basic work required by the contract.

Mr. Pearson testified that at a meeting at the golf course September 28, 1962, with Mr. Pearson, secretary of plaintiff corporation, Mr. Spear, architect for defendant, and Mr. Hammond, representing the defendant, present, defendant accepted the work of plaintiff as having been completed by reason of Mr. Hammond and Mr. Spear authorizing plaintiff to do extra work on the golf course. Defendant denied that it ever approved the job. No written final approval was ever given by the architect. He did, however, approve various parts of the work, and nearly all of the basic contract price was paid for by defendant to plaintiff.

Plaintiff's exhibit number 6, a checklist dated 7/25/62, indicated work to be corrected by plaintiff.

Plaintiff claims it performed in accordance with that checklist. The exhibit bears the typewritten initials of Mr. Spear; however, he disclaimed making it. On four occasions, a representative of plaintiff informed Mr. Spear, the architect, that plaintiff had completed the job and asked for a final inspection. Mr. Spear testified that upon each inspection, he found work yet to be accomplished in order to meet the specifications. On November 14, 1962, he wrote a letter to plaintiff stating in part as follows:

"Of major concern now is the lack of sufficient topsoil on the turf areas. Referring to my specifications 'earth moving and grading work' item 4: stripping and respreading topsoil—Existing topsoil shall be stripped in sufficient quantity to permit replacing six inches of topsoil over all proposed lawn areas disturbed by grading operations. All existing topsoil shall be saved. All topsoil shall be kept free of subsoil and debris.

"Your failure to abide by this specification, especially when more than adequate amounts of topsoil were available, is the most serious offense a contractor can make in the construction of a golf course since a thick, healthy turf is so essential to good maintenance. Prior to the start of your construction work on this site, Mr. Hammond had soil test borings made in various locations throughout the property. It was found the depth of topsoil averaged 12 to 13 inches. After most of your grading work was completed another soil survey was made and most areas showed only 3 to 4 inches of topsoil existing and many areas with only 1 to 2 inches."

There was no mention in the letter of any claim that plaintiff improperly left stone on the golf course.

Plaintiff's exhibit 5 was an architectural drawing of grading and dimension plan for the golf course.

This exhibit had marked on it in green, "topsoil depths checked by J.A.O., 7/24/62"; and in red, "topsoil depths made by Mr. Hammond's engineer and maintenance man, 9/5/62." Mr. Pearson testified that this exhibit was shown and given to him the week of September 27, 1962, by Mr. Hammond as representing the depth of topsoil throughout the entire course. According to this exhibit as explained by Mr. Pearson, the replacement of topsoil by plaintiff was insufficient, as appears from Pearson's testimony as follows:

"*Q.* Can you tell us now from that print where those circles were, for the purposes of the record?

"*A.* Yes, sir. There is an area of 2" along number 5 fairway, about midway. It would be to the west of the center line. There is an area of 2" of depth to the west of center line of fairway 4; at the intersection of the grid marks number 17 and F.

"*Reporter:* F as in Frank?

"*Witness:* Yes, ma'am. That is two areas that—

"*The Court:* I thought you said three areas.

"*Witness:* Three areas—

"*The Court:* Maybe you said two.

"*Mr. Hamilton:* I don't think he said the number.

"*The Court:* Okay. Two areas then is all there are, is that correct?

"*Witness:* That is correct, sir, that I can pin-point now. I don't see any more than two areas.

"*Mr. Hamilton:* Now, did you do anything in regard to making the depth of that topsoil greater in those areas?

"*Witness:* Yes, sir.

"*Q.* And can you tell us how you did that?

"*A.* We took a Michigan loader, and in some areas there was as much as 10", and we skinned the topsoil off of that area and put it into the low areas where it was deficient.

"*Q.* On this exhibit there appear three cross-hatches or x's in pencil. Who put those on there?

"*A.* I put them on.

"*Q.* And why did you put them on?

"*A.* Mr. Niewoonder, in seeding the area, found low deficiencies of topsoil in those three areas, and I likewise increased the size—tried to bring them back up where it should be."

Mr. Niewoonder, who did the seeding of the golf course for defendant, testified concerning the placing of additional topsoil as needed.

The architect did not personally test the depth of topsoil present at the various points on the golf course nor did he have anyone do it under his supervision.

The trial judge determined that defendant failed to sustain its burden of proof as to the claim that plaintiff failed to remove stones from the golf course; however, he ruled defendant had proved that plaintiff failed to properly replace topsoil to the proper depth in 2 areas shown by exhibit 5, and awarded defendant the sum of $249.55 for extra architect fees required due to such failure and $2,245.75, the cost of bringing in extra topsoil to comply with the specifications.

After careful review of the record, we conclude that there was competent evidence present to justify the court's findings as to the areas deficient of topsoil and the proper amount of damages to be awarded defendant against plaintiff representing the cost of remedying plaintiff's failure to perform. Likewise, there is adequate evidence to justify the court's finding that plaintiff was entitled to recover for the extras claimed. The facts concerning these matters were in dispute and presented questions of fact for the judge to determine. This Court does not substitute its judgment on questions of fact in a nonjury case unless the evidence clearly preponderates in the opposite direction. *Northwest Auto*

*Company* v. *Mulligan Lincoln-Mercury, Inc.* (1957),
348 Mich 279.

This leaves one question remaining to be resolved;
*i.e.,* did the plaintiff P & M Construction Company
carry its burden in showing performance on the con-
tract?

The trial judge did not find proper performance
of all the terms of the contract, but did in effect
rule that there was substantial performance. The
trial judge ruled that plaintiff should be awarded the
full amount due on the contract less defendant's
damages for plaintiff's failure to properly perform.
The damages awarded defendant were for costs to
correct defects resulting from improper performance
in the amount of $2,495.30. These damages repre-
sented replacement of topsoil to two small areas
constituting a small percentage of the golf course
constructed by plaintiff.

Substantial performance has been defined in 13
Am Jur 2d, Building and Construction Contracts, §
43, pp 46–48, as follows:

"While it is difficult to state what the term 'sub-
stantial performance' or 'substantial compliance' as
applied to building and construction contracts
means, inasmuch as the term is a relative one and the
extent of the nonperformance must be viewed in rela-
tion to the full performance promised, it may be
stated generally that there is substantial perform-
ance of such a contract where all the essentials neces-
sary to the full accomplishment of the purposes for
which the thing contracted for has been constructed
are performed with such an approximation to com-
plete performance that the owner obtains substan-
tially what is called for by the contract. Imperfec-
tions in the matters of detail which do not constitute
a deviation from the general plan contemplated for
the work, do not enter into the substance of the con-
tract, and may be compensated in damages, do not

prevent the performance from being regarded as substantial performance.  *  *  *

"In the last analysis, the question as to whether there has been substantial performance is one of fact for the trier of the fact, and it may be added that whether there is a substantial performance of a building contract is to be determined in reference to the entire contract and what is done or omitted under it, and not in reference to one specification."

Michigan follows the substantial performance rule, *Gutov* v. *Clark* (1916), 190 Mich 381. The facts in the case at hand come within the rule because the omissions were minor in nature and extent and of a type that were able to be remedied by the owner at reasonable expense.

The measure of damages for defects or omissions recoverable under the substantial performance rule appears in 76 ALR2d 805, Cost of correction or completion, or difference in value, as measure of damages for breach of construction contract, § 3, p 810, as follows:

"The view expressed in many decisions is that where the particular omissions or defects in the builder's performance of a construction contract are of a type that may be remedied by the owner at reasonable expense, the cost of remedying such defects may be deducted from the contract price, or, in other words, measures the damages for the builder's breach of contract."*

The trial judge applied this rule in awarding damages and, but for the allowance of the plaintiff's claims for contested extras in the amount of $543.50, the relief granted represents all that defendant could legally obtain under their requests on this appeal.

---

* *Gutov* v. *Clark, supra.*

The trial court properly found that plaintiff sustained its burden of proof in showing substantial compliance or performance of the contract.

For the reasons stated herein, judgment is affirmed. Neither party prevailing on appeal, no costs are awarded.

FITZGERALD, P. J., and T. G. KAVANAGH, J., concurred.